The next case on our calendar is also Severstal and Thomas Perez vs. WPN. Thank you. Yes. Good morning. Good morning. May it please the court, Daniel Kobrynek for the appellants. The appellants are Lebeau and WPN? And WPN, yes. The district court said that it was sufficient for purposes of determining liability that Lebeau and WPN appellants were fiduciaries under sub 2 of the ERISA definition of fiduciary. That is that they rendered investment advice for a fee or for compensation. Now, the district court didn't say that they were also fiduciaries under sub 1 and sub 3. Your adversary argues that the district court made findings that make clear that they were fiduciaries under sub 1 and sub 3. That is correct. It's not the basis of the finding of liability, but it is correct. I would just address those really quickly. In terms of their supposed exercise of discretion or control, the district court made two findings. It found that in November, early November of 2008, appellants exercised control by directing the transfer of the New Brigger Berman assets. That's incorrect. If you look at the record. Clearly erroneous is what you need to establish. Clearly erroneous, yes. But if you look at the record, the direction went to the trustee from two entities. It went from Severstall and it went from WHX. They both sent letters to Citibank directing Citibank to transfer and the exact wording is all of the assets in the New Brigger Berman account. They didn't direct a transfer of a proportionate share or anything like that. They said all of the assets. So that direction did not come from appellants. And in fact, Nancy Cronenberg, who was the Citibank, which was the trustee, officer responsible for dealing with both of these accounts at that time, said she wouldn't have taken the direction from appellants. They had no authority in her eyes. So the first supposed exercise of authority was not an exercise of authority. It was advice. The second exercise of authority occurs on March 24, 2009 when Mr. Lebeau told New Brigger Berman sell off the assets which are in the New Brigger Berman account. And that is an exercise of authority. However, no one has testified that it was an improper exercise of authority. And the reason it didn't occur until March 24, 2009 is that in February, there's a document in which Michael DiClemente admits New Brigger Berman told him that appellants had no authority to give investment directions to New Brigger Berman. And there was no account at New Brigger Berman, no trading account, until March 20th, which was a Friday, late Friday afternoon. On Monday, the market went crazy, went way up. On March 24th, the beginning of the day, Mr. Lebeau tells New Brigger Berman sell. So in terms of the- Just to be clear as to the structure of what we're saying, I take it that this is all an argument that the district court's factual findings that would support a fiduciary relationship under sub one or you'll get to sub three eventually are clearly erroneous. It is not an argument that we should only look at two because that's what the district court hung its hat on. In other words, my initial question to you was more limited, which is just, is it enough that the district court made the factual findings that would support your clients being fiduciaries under A1 and A3 without the district court having attributed that as the reason for its judgment? And I take it you're not really disputing that the district court did effectively find that your clients were fiduciaries under all three sections. You're just saying, but two of them are not just saying, you're saying importantly that two of those sets of findings are incorrect. That is correct. The court, I guess I found this a little bit confusing, but the court said that the basis for liability was sub two. It did not explicitly find that we were also fiduciaries and had liability because we exercised or had discretion, had control. Having said that, the court certainly did make factual findings that we did exercise control and that we did have control. And my contention is that both of those findings are clearly erroneous. Now, in terms of the finding that we had control, I mean, here you have pretty much unanimity from all the witnesses. The Citibank's only witness testified they had no control. They never had control. Now, the only witness who testified that we ever did in the beginning of 2009, January 1, 2009, First National City or NatCity Bank, National City Bank, I should say, becomes the substitute trustee. And there are two employees of NatCity who dealt with this issue. Amanda Pierce testified pretty emphatically that, yes, they have control. But we have no control with her because she won't even speak to us. She refuses to take our phone calls. And the other representative from NatCity, National City Bank, says basically, no, they would have had control if certain other steps had been taken. But the people I recognized as having control are the people who were named on a document, the certificate as to signatures, that was prepared and sent to National City by Severstall. And that document says very explicitly, you want to know who has control? These are the people who have control. They are all Severstall employees. Lebeau and WPN Appellants were not named at all. And it said you can only take direction from these people. You know, it seems pretty clear from the documentary record they never had control. They never exercised control other than the one time when they told Neuberger-Berman, sell. And after that and before that, they were explicitly told, Michael DiClemente in his internal memo said emphatically told, don't do anything. And when they told Neuberger-Berman, sell, did they sell? Yes, they did. They did. I just want to point out, I mean, in the prior argument, Mr. Barton effectively admitted that the direction to Citibank came not from appellants. It came from Severstall and it came from WHX. And that the discretion to give that instruction belonged to Severstall and it belonged to WHX. Do you know anecdotally why these cases were not tried together? Well, their case was dismissed before it was dismissed on pleadings and our case went to trial. Right, but they were not brought simultaneously? My recollection, this is going back a few years. First, there was a complaint against us. The complaint was subsequently amended to include them. It was the same case in the district court. Oh, I see. And then it got split because of? It got split because it wasn't a final judgment for Severstall to appeal until the case against you folks was over, which went forward to trial. There had been some parties were dismissed, but only when the case is finally over do they get to appeal the part against WHX. That's correct. In terms of what you were addressing before, Severstall does not have a right to a 10% share of each individual asset. People who retire don't have a right. Isn't that what the agreement said, though? Well, the agreement was changed by letters sent by Severstall and WHX to Citibank saying, we direct you to transfer all of the assets in the Newberger room account. If you're transferring all of the assets in that account, you're basically transferring 90% of what Severstall can get. It's not mathematically possible for them to get a pro rata share of everything else. I would point out, at trial, Severstall's ERISA attorney testified. They had an ERISA expert who testified. They both testified, no, they're not entitled to 10% of each individual asset. They're entitled to a 10% share of the overall account. What document is it that establishes that? Sorry? What document is it or documents that establishes, that supports what you're saying? We had a commingled trust that maybe, when it was formed, it wasn't anticipated that at some point a party would want to pull out entirely. There seemed to have been a lot of discussion about what was possible, what was not possible, in terms of separating out the assets. And that's kind of where the problem arose. So what documents exactly establish that there was no right to a pro rata share of all of the assets that were held? Well, there's testimony. And it was testimony put on by Severstall of Severstall's ERISA attorney and their ERISA expert. So that was their perception about the law or expectations of the party? Yes, it was their perception of the law. So there was no document that established one way or another exactly what they were entitled to when you tried to disentangle the two parties, right? Well, I would tell you that the document upon disentanglement is dated November 3rd. It was sent November 4th. But it's a letter from Michael DiClemente, who is the de facto head of the Severstall Retirement Committee, to his trustee, Citibank, in which he said, we direct you to transfer all of the assets. But that's still after the fact. That's after the decision is made that they need to be separated, that the house needs to be sold. There's going to be a divorce, right? Well, yeah. In terms of the actual decision to separate the entities, my understanding, that goes back a ways before the November 3rd transfer. But Severstall had originally been part of a larger WHX. We're going to hear from Mr. Barton about this, but it has not been my understanding that Severstall has ever claimed that they had a legal right to a 10 percent slice of everything. That's what they requested because that's what they thought would be the most equitable or reasonable or appropriate distribution. Maybe I'm mistaken about that, but it has not been my understanding that anyone at trial maintained that as a legal matter, when you split up a trust like this, the party is entitled to divide the house down the middle, by my analogy, as opposed to to get your proportionate share of value out of it. I think I better let him answer that. Counsel, before you leave the podium, do you want to speak to the fact that the portfolio was non-diversified? It was non-diversified. It was also highly liquid. When this portfolio was transferred, Mr. Lebeau told Michael DiClemente, you need to open a trading account. And on November 5th, two days after the transfer, Michael DiClemente sends Mr. Lebeau an email saying, for your information, we're opening an account at Neuberger Berman. Now, having told Mr. Lebeau that, he then ignores what he told Mr. Lebeau and just doesn't do it. There are subsequently lots of meetings or lots of communications, I should say, and those communications reflect Mr. Lebeau telling them, open an account at Neuberger Berman. They never did. Okay, he tells them to open an account. Can you comment on what I think is the strongest argument that the other side has for breach? Mr. Lebeau is the investment advisor. He's actually, maybe he doesn't, and you have an interesting argument, the trustees wouldn't recognize his authority, but as far as Severstolt was concerned, don't they at some point appoint him, give him discretionary authority? Now, maybe they didn't follow through in all the ways that would let him exercise it, but as between the two of them, he's supposed to have discretionary authority, right? Well, he's certainly supposed to. Understood. Okay, so here he is as the advisor who purportedly may be on the hook because of having actual authority, and doesn't he have to jump up and down and tell them, diversify, you're in a terrible position here, not just say, oh, you need to open an account so we can then decide what to do with these assets, but once they have this non-diversified asset, which it seems to me, and I haven't heard anybody say anything to the contrary, is totally liquid, there's nothing that prevents them from diversifying it if they choose, why isn't he pounding on the desk saying, you guys have a portfolio of securities that is going in the toilet, it's going downhill, it's one industry, you've got to do these things because you've got to diversify that and here's my plan for what you should be investing in, and to do that you need to open this account, as opposed to just, oh, the next thing, guys, is sign this paper so we have an account at Neuberger Berman. Well, I would tell you, you know, could he have jumped up and down more? Yeah. However, But isn't it ultimately a question of fact as to whether he is fulfilling his responsibilities as an advisor? No. Well, I will tell you, I mean, in early January there are e-mails indicating that at that point Mr. Lebeau was saying sell everything. On February 11th, Mr. Lebeau said, look, this is taking so long, just sell everything, go to cash. Those e-mails were ignored. Well, but eventually they do go to cash. Well, eventually. Eventually, but then it's in cash and that's still not what it should be. No, it's not. So I'm just trying to, you know, I mean, the question is, and we had an expert that said actually his responsibility is to quit if they're not doing the things that he's advising because it seems to me that what that really means is that's a way of jumping up and down for real, that he has an obligation to give them forceful advice and not let them just fritter things away. The expert actually said, he initially said on direct he has an obligation to quit. On cross-examination he said, well, it's not really an obligation. He has an option to quit. But that meant that, as Judge Lynch is saying, that the quitting is a way of jumping up and down. He didn't have a legal obligation to quit and like to terminate his employment relationship, but still to, you know, ring the fire alarm very loud. And he had a duty to call the committee's attention to this in an effective way. That's your point, I think, doesn't undermine the expert's testimony. Well, I think, you know, if you look at what takes place in early January, where there's a host of telephone conferences with Mr. Levelle, and he's telling them over and over, Sal, and he's telling them over and over, here are some things that I'd like you to invest in. And all of this advice. He never gave them a plan. He never gave them an investment plan. Well, in terms of a plan that you're going to be 30% in this and 40% in that, that's true. They never approved any investments that he suggested. He couldn't get feedback on this is something we're interested in or it's not. An individual investment outside of the idea of a plan seems inconsistent with his general obligations here. I mean, they've gone from being part of a commingled trust to a new entity altogether, and it's liquid, as Judge Lynch has proposed. But they have an obligation to diversify it and to do this in an organized way. Why was it consistent with his ñ you say that he offered some suggestions, but he never offered a plan, as Judge Pooler said. I mean, you know, what he offered were components of the plan, of a plan, and he couldn't get feedback on it. I mean, he suggested certain investments. He said, I want you to look at these things. Are these things you're interested in? And the response was no response. But didn't that have to be part of a comprehensive plan in order for those to be meaningful suggestions? I don't think so. I mean, it's just not, you know, buy some startup stuff. I'm not aware of an ERISA obligation that you have to have a comprehensive plan. You have to invest in a diversified fashion. And, you know, if he's proposing specific investments and they're telling him, no, we're not listening to you. What we really want is a retroactive reallocation with WHX, where you're going to go take assets that WHX kept and split them off, split off 10 percent of each of them and give them to us. You know, at that point ñ Why couldn't he then execute something very close to that by selling the Neuberger-Berman stuff or taking the cash after it was sold and replicating the WHX investment program as best he could? Well, there are two answers to that. The first is he didn't have authority anywhere to direct any sale of assets or any reinvestment. What I'm saying is you say he didn't have an obligation to give them a plan because what they say is here's what we'd like to have done. Now, maybe he can't go back to WHX and unwind the transaction, but what they're telling him is we'd like to buy securities that look like 10 percent of the shares of what was in WHX. Now, maybe all those things couldn't be quite accomplished perfectly, but why isn't that a perfectly coherent plan? Well, the other half of that answer is that what they told him is that's not what they wanted. What they wanted was a retroactive reallocation where they were getting the benefit of the investment results that WHX had. And in point of fact, in cross-examination, Mr. Halpin and Mr. DiClemente were both asked, were you looking to diversify or were you looking for a retroactive reallocation where you got this essentially set of assets from WHX? And they both responded, we're looking for a retroactive reallocation. So, you know, to put it bluntly, his hands were tied. He's told essentially, don't do anything until we know that we can do a retroactive reallocation. And he's telling them, you can't, it's not possible, they don't believe him. They finally believe it, you know, after a couple of months when WHX says, we're not giving you a retroactive reallocation, but they don't believe LeBel. He can't do it because Neuberger Berman won't take his instructions. Citibank won't take his instructions. Citibank is out of the picture by then. And Nat City won't take his instructions. There's no one he can talk to to say, hey, there's a group of stocks sitting in this account. Sell them and here's what we're going to do. No one will take his instructions. I mean, I can't call up Merrill Lynch and say, there's this third party and I want to change what's in their account. I want to sell off what they have and reinvest in something else. They're not going to take my call. And that was his situation. I mean, until the Severstall Retirement Committee does what it has to do to give them the authority that he was supposed to have, he can't tell anyone to sell or buy anything. I think this is a good point to stop because we're going to hear from Severstall. You've well exceeded your time limit, but you have reserved two minutes for rebuttal, which I will allow you to keep. Thank you. Mr. Barton. Thank you, Your Honor. Please report. Joseph Barton again. Appointees. What the appeal here focuses and challenges exclusively the district court's findings of facts that occur after an eight-day bench trial. And what you've heard is Mr. Laveau's versions of those facts. And much of what happened at trial was testimony from Mr. Laveau, on the one hand, and I would say virtually everybody else, on the other hand, about what happened. And at the end of the day, what the court did is she weighed the credibility of those witnesses. Time after time, in 50 pages, she went through findings of fact and conclusions of law. She did a thorough analysis of fact and of the law. And she found, in large part, Mr. Laveau's story, his explanations were not credible. And that's the basis, and that's the basis that this court should affirm. The other thing that I would like to point out is the defendant started arguing about fiduciary status. But if you look at his brief, he doesn't challenge fiduciary status. What he challenges is the court's findings of whether or not there was a breach. That's the heart of his brief. In the legal arguments in his brief, he has not challenged the district court's determination, which was on summary judgment prior to trial on A2, that he was a fiduciary. I can address some of those. The other interesting thing is that for the first time, Mr. Laveau, through his counsel, has conceded that he directed the liquidation on March 24, 2009. That was an issue contested at trial in which Mr. Halpin said he didn't do it, who was the only person then remaining on the Severestall Committee. Mr. Schwartz said he didn't believe that Mr. Laveau had done it. And Mr. Laveau insisted he hadn't done it, but the court found that Mr. Laveau had, in fact, issued the instruction. We spent some time talking about whether Laveau and WPN were fiduciaries under sub-1, sub-2, or sub-3. Does that choice affect the scope of their liability? No, is the answer. I can explain further, but the answer is if there are fiduciaries under any of those, certainly if under A2, under A3, it will not affect the liability. Under A1, the argument would be, I think, from the other side, is that there has to be actual exercise of the authority, which clearly they exercise in connection with the transfer and on the 24th, March 24, 2009. So maybe it's more limited under A1, but for purposes of A2 versus A3, it won't matter. Let me just explain a few things that the defendant has raised here. He argued, and these are all arguments about what the facts show. First of all, he argued about what happened on November 3, 2008 and when it was completed. And here in the district court, what the district court found is that the Severstall Trust Funds were held by Citibank. I'm sorry. Citibank carried out the transfer instruction on Monday, November 3, 2008, and the transactions settled on that date. And what she cited in support is stipulation, paragraph 33. There was a stipulation that that is what happened. Whatever happened after that on November 4 by Mr. DiClemente is irrelevant. It settled. It was done on November 3, and it was done pursuant to a written instruction that came from WHX, but that Mr. Lebeau instructed that man, Mr. McCabe, to do whatever it takes to get it done. That was the trial testimony. He admitted he was the button pusher. He was the one instructing what was going to happen with respect to the transfer. That makes him a fiduciary under any three of the prongs. Why was he a fiduciary under A1? Because he exercised the discretion or authority by telling the guy to do what it takes to get it done. He is under A2 because there is an agreement effective as of November 1 that makes him the investment manager. The fact that it was not signed until December 5 is irrelevant. He agreed. He wrote in the date, November 1. He was a fiduciary as of that date. He was the investment manager. He was a fiduciary pursuant to A2. And he was also a fiduciary pursuant to A3 for the same reason. He had authority of the administration of the plan. Arguments as to whether or not Citibank, National City, would recognize his authority, those are arguments that Mr. Lebeau made. They were arguments that factually were rejected.  It happened without the approval. It settled before Mr. DiClemente ever sent his letter on November 4. The other important thing is that Ms. Cronenberg from Citibank, the only witness, and the witness that Mr. Lebeau said that she wouldn't recognize his authority, she testified Mr. Lebeau never talked to her after November 3. So this independent third-party witness testified Mr. Lebeau never, there was no rejection of any authority. If he thought she wouldn't talk to him, that was just something in his own mind. She testified he never talked to her. National City. Again, that's Mr. Lebeau's version of what happened. What National City testified to is at that point there was a written, signed investment management agreement in place, which had existed ever since December 5. National City came in as the trustee effective January 1, 2009. They testified that the investment management agreement, if they had been shown that, that was sufficient for them to follow the instructions of Mr. Lebeau. And, in fact, they did talk to Mr. Lebeau. The testimony that Mr. Lebeau's counsel is confusing is not that they wouldn't talk to him. What they said is that they testified that Mr. Lebeau was an unpleasant man to deal with, and the account representative there asked that she not have to deal with him anymore. But it was not that National City as an organization wouldn't talk to Mr. Lebeau or wouldn't recognize him. With respect to what the questions, and this goes, Judge Lynch, to your question about the authority or the right to get a pro rata share, what there was, as we said, there was an agreement between WHX and Severstal in terms of what they would get. I understand that, but just to be clear, you're not maintaining that, as a matter of law, independent of any agreement, Severstal was entitled to a 10 percent split of each of those investments in the account? I think, quite frankly, I would say that what they were entitled to prior to that agreement is that they were entitled to, and I think we may, that is in the findings, they had a 10 percent interest in each of these funds. And I understand, I think your analogy of a house perhaps is a little bit off. If we were to say, both have season tickets, two tickets that we have, to the New York Yankees and the New York Mets, and I understand that in New York people don't do that, but let's assume for the moment, and the face value is otherwise the same, and you decided that you were going to, we were going to part ways, and you were going to take the two New York Yankee tickets and leave me with the two New York Met tickets, I might not be happy with that division. You might not be happy, but in terms of what a court can do, or if this came to litigation in the absence of some agreement, if it's divisible that way, maybe so. If it's not, probably not, right? All I'm getting at is I don't believe, and you can tell me if I'm wrong, that there was ever a contention that as a matter of law there was an absolute obligation, an absolute entitlement to this kind of split, independent of an agreement to that effect. And I think the answer is we didn't need to contend that because we had the agreement. That's the answer to your question, but I think, I just wanted to sort of get away from the idea about the house and how to split it up. And I think if you look at the testimony, what Mr. Kobrenik actually asked was not, is there something that, in the context of this case, were they required to get a 10% interest of each? What he asked, my fiduciary expert, was sort of generally under ERISA, is there a legal requirement that you receive a proportionate share? And he said, first of all, my expert is not a legal expert, he's a fiduciary standards expert, but what he says is, well, there probably is, there's nothing I'm aware of under ERISA, or some of the words to that effect. It's a more general question. This sort of answers to your question, not in the context of this case. There's not some concession there. With respect, I mean, I think... Would you deal with Mr. Kobrenik's argument that Lebeau just didn't have the power or the control to do anything? I think that is, again, an argument that Mr. Lebeau raised. It was rejected by the trial court. He certainly had the power to deal with Citibank, he had the power to deal with National City, and he had the power to liquidate the assets, and that's evidenced by the fact that the court found that he did, in fact, liquidate the assets on March 24th, that he has admitted he liquidated the assets. There was testimony that there was no... Any broker, any... They could have liquidated those assets. The problem, so he had the authority, and the problem is not that he... Mere liquidation does not solve the problem, as Judge Lynch noted, or I'm sorry if I'm confusing, but having cash sitting there undiversified is not a diversified portfolio. Thank you, Your Honor. And for those reasons, I believe the district court's decision should be affirmed. Thank you. We'll hear from the Secretary of Labor. Please, the court. Mark Serrata on behalf of the Secretary of Labor, and I'd like to thank the court for granting our motion for time today, particularly in light of the lateness of the filing of the motion. We appreciate the courtesy. Your Honor, you've heard... The court has heard a lot of commentary about the investment advice, which is the second prong of the test for fiduciary duty. While we think that those factual findings, if you look at the record, well support that finding, we think that there are grounds for affirmance on these additional grounds. And the Secretary's interest in affirmance period is ensuring the investments and the funds of the beneficiaries and participants in these particular plans. But as far as affirming on these other grounds, what we think the court's interest and we think our interest is, is making sure that under facts like this, there's no ambiguity that actions such as the defendant's give rise to fiduciary status under all three portions of the test. We think it's a little limiting, and we think that defendants will get creative. There will be a lot of these discussions about what was our advice and things like that. But we think that the record is sufficient to support that defendants had not only exercised power over the plan assets, but actually had actual authority. I think it's clear from their status as an investment manager. When you look at the documents, they are granted the power to dispose of all planned assets. And there's no ambiguity there. That removes all this discussion about I gave advice about investing in mortgage-backed securities, and that wasn't sufficiently diversified. He has the power. He has fiduciary duties, which are the highest known under law, to do something. And it's more than simply jump up and down. Actually, he had the power to liquidate the assets and to diversify the assets. That's shown by the fact that he did liquidate. Without approval from anyone else? If the committee wasn't approving, well, there are two parts of that. He could have simply gone to the committee and drawn attention to the fact that he had the power to do it. I'm going to do this unless you tell me otherwise, because I have the duty to do it. He could have resigned. He was not under an obligation to resign, but there are other avenues for him to take here. And that's shown by the fact that he did, in fact, liquidate the account in March of 2009, several months later after all of these damages, excuse me, after all of the losses were suffered by the plan. But the argument that I am relieved of my fiduciary status because the committee didn't establish a trading link or that the bank won't listen to me, that simply is a dangerous path to go down, because the fact that there are obstacles to the defendants exercising their fiduciary duties and doing what they need to do to protect the beneficiaries and participants doesn't relieve them of that fiduciary status. And that's the point that the Secretary made. So you're saying he has to at least try? He has to try, Your Honor. And that's all evidenced by, in this case, we've got the fact that he did liquidate the assets. So we know that whatever anybody says about would they have listened to him, at some point, they did. He calls them up and says, sell all these things, and they do. That's correct, Your Honor. In addition, the court found— So presumably if he had said the next day, and now by Microsoft, they could have done that. That's correct. We expect there's a reasonable basis for the judge to find that they would have done that if they heeded his instructions to sell the securities in the first place. That's right. And there were factual findings discussing that he simply—that there was no impediment to him establishing a trading link, that there were avenues for him to act, and he did not act. Counsel, as is relevant to this case, could you describe the Pennsylvania litigation? You're suing WPN in Pennsylvania, are you not? The Department is, Your Honor, that's correct. I am not personally involved in that litigation, but I'm aware of it and I can speak to it generally. Generally, how it relates to this? The Secretary is suing, in addition to Mr. Laveau and WPN, another set of fiduciaries attempting to restore some of these losses. Is it the same pot of money that they're looking for? It is the same period of losses, and whoever has a larger pot of money is able to restore those losses to the plan. That's right. There would not be a double recovery, Your Honor. Just to be clear, first of all, there's no double recovery. If there is a recovery under this judgment, then presumably you don't get to make Mr. Laveau pay more. On the other hand, I'm guessing that he's not going to be able to make good all those losses if this judgment is affirmed. Otherwise, Mr. Barton wouldn't be so emphatic about pursuing the WHX folks because they're probably a deeper pocket. By the same token, the other fiduciaries you're suing are the former retirement, if I'm not mistaken, former retirement committee at Severstal. Your Honor, I'm out of time, but I'd like to answer the question. Please answer. Yes, that's correct, Your Honor, and as with any judgment, there are collection risks. Yeah, and I can see why they would have issues about suing those people, but you're suing them. And the department's position anyway, for better or worse, is that both sides could be to blame, right? Or both sides could have fallen short. Both sides between WPN as investment manager and the retirement committee, they could both have screwed up because they both had an obligation to make sure that there was diversification. That's correct, Your Honor. Under ERISA Section 404, there's a duty to monitor other fiduciaries in addition to some of the annoying fiduciary breach issues that were discussed in the previous case. So there is an independent fiduciary duty, the Secretary believes, on behalf of the committee, in addition to what types of fiduciary duties and responsibilities as an investment manager that Mr. Labeau of WPN had. Thank you. Thank you very much. Thank you very much. Mr. Kopernik, you have two minutes. Just to respond to Mr. Barton, he argued that it doesn't matter what type of fiduciary you are. Of course it matters. If you're a fiduciary who's hired to give investment advice for a fee but you don't have control, you can't be liable for not exercising control. In this case, the only exercise of control, real exercise of control by appellants, is on March 24th. And on March 20th, there is communication between the Severstall Committee and Newberger-Berman telling them, okay, we now have an account, we finally opened it, and we're going to liquidate. The New York Yankees-Mets analogy makes no sense because pension plans only have interest in investments. They don't have an emotional attachment to particular investments. Investments are worth their assets. They're worth money. Hopefully they'll appreciate. If you get your money, you're happy, whereas your Yankee tickets may be dear to you because you're a big fan and your Mets tickets may not be so dear to you. Finally, the allegation that we had the power to liquidate is clearly erroneous when the court found it because there's no one who will take our call. And we don't have possession of these securities. They're held by a trustee who won't take our direction. The brokerage house won't take our direction. And we can't, even though, yes, any broker, they could have opened a trading account at any broker, no broker is going to take a call from a stranger to this account. If they're not our assets, we can't just call up and say, hey, you know, there's someone else who has these stocks. Sell them. That's all. Thank you very much. Thank you, all three of you. Very lively argument. The next case on our calendar is on submission. So I will ask the clerk to adjourn court.